UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JILL FERGUSON,                                       Case No. 23-CV-0546 (PJS/LIB)

                  Plaintiff,

v.                                                                          ORDER

COUNTY OF CLEARWATER and
ALEXANDER YOCUM, in his official and
individual capacity,

                  Defendants.

---

      Timothy M. Phillips, LAW OFFICE OF TIM PHILLIPS, for plaintiff.

      Ashley Marie Ramstad and Stephanie A. Angolkar, IVERSON REUVERS, for defendants.

      Plaintiff Jill Ferguson brings constitutional and state-law claims against defendants Alexander Yocum and the County of Clearwater ("the County") arising out of her July 2021 arrest. This matter is before the Court on defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim. For the reasons explained below, the Court grants defendants' motion as to Ferguson's constitutional claim and declines to exercise supplemental jurisdiction over her state-law claims.

I.  BACKGROUND

      On July 29, 2021, Ferguson, a 68-year-old Wisconsin resident, participated in a protest against a pipeline project near the headwaters of the Mississippi River. Compl.

¶¶ 3, 7, ECF No. 1.  The focus of the protest was a pump that drew water from the river and that was surrounded by a metal fence.  Compl. ¶ 8.  Yocum and another deputy were called to the site to respond to the protest.  Compl. ¶¶ 5, 9, 20.  The deputies spent about 45 minutes negotiating with the protesters and another 45 minutes reading dispersal orders to the protesters.  Compl. ¶¶ 10–11.  In all, Ferguson and her fellow protesters were given about two hours to leave the site prior to any use of force.  Compl. ¶ 22.

Almost all of the protesters left; Ferguson did not.  Instead, she grabbed onto a chain secured to the fence with both hands and refused to let go.  Compl. ¶¶ 8, 12.  Yocum warned Ferguson that if she did not release her grip on the chain, he would apply force to remove her hands.  Compl. ¶ 2, Honor the Earth, *Bad Ass Grandma Arrest Firelight Camp*, YOUTUBE, at 00:05–00:13 (July 30, 2021), https://youtu.be/a8IE224Lgrk [*hereinafter* Arrest Video].  After Ferguson refused to release her grip, Yocum attempted to pry Ferguson's hands away from the chain for approximately eight seconds before Ferguson told him, "You're hurting me."  Arrest Video at 00:16–00:24.

After Ferguson complained that Yocum was hurting her hands, Yocum stopped trying to pry her hands, and instead turned to a series of pain-compliance techniques.  Compl. ¶ 13. First, Yocum applied pressure to Ferguson's mandibular angle, a pressure point near the ear, which pressed her head against the fence.  Compl. ¶ 15.  Yocum

applied the pressure for approximately five seconds.  Arrest Video at 00:25–00:31.  Once Yocum ceased applying pressure, Ferguson reiterated that Yocum was hurting her and that she would not remove her hands from the chain.  Arrest Video at 00:31–01:02.

Next, Yocum twisted Ferguson's elbow up and simultaneously pulled at her right hand, forcing her to release that hand's grip on the chain.  Arrest Video at 01:00–01:03; Compl. ¶¶ 16–17.  Yocum continued to move Ferguson's extended right arm behind her back and lifted it up towards her shoulder.  Compl. ¶ 18.  Ferguson shouted that she was being hurt and added that she had a "metal neck" and a "metal leg."  Arrest Video at 01:12–01:20; Compl. ¶ 14.  She also stated that she had "chronic, severe—" but did not finish the sentence.  Arrest Video at 01:16–01:18.  At this point, Yocum relaxed her arm back down to her side.  Arrest Video at 01:20–01:23.  Meanwhile, Ferguson continued to hold onto the chain with her left hand, refusing repeated commands to let go.  Arrest Video at 01:21–02:15; Compl. ¶ 17.

Finally, Yocum used a pain-compliance technique known as a "bent arm escort" or "compression wrist lock," which bent Ferguson's elbow, wrist, and fingers in a manner that made Ferguson think her hand would break.  Compl. ¶ 19.  Yocum held Ferguson in the wrist lock for approximately 42 seconds.  Arrest Video at 02:17–02:59.  About 35 seconds after the wrist lock was applied, Ferguson told the bystander who was recording the arrest on video: "Zoom in on this.  He's pressing my wrist back.

I have severe arthritis. He can break me easily." Arrest Video at 02:47–02:54. Yocum released Ferguson from the wrist lock when the other deputy was able to disengage Ferguson's left hand from the chain. Arrest Video at 02:54–02:59; Compl. ¶ 20. Once Ferguson's grip on the chain was released, the deputies were able to lead her away to the police car without further incident. Arrest Video at 02:55–03:08.

Ferguson alleges that Yocum's use of these pain-compliance techniques caused her injury, including post-concussion syndrome and a "frozen shoulder." Compl. ¶¶ 18, 25–26. She brings an excessive-force claim under 42 U.S.C. § 1983 against Yocum and related state-law claims against Yocum and the County.

## II. ANALYSIS

### A. Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

Defendants ask the Court to consider materials not cited in the complaint, including police body- and dash-cam recordings. Defs.' Mem. Supp. Mot. Dismiss 7–8, ECF No. 12. The Court has considered the recordings, *see Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) ("Videos of an incident are necessarily embraced by the pleadings."), but otherwise has not considered defendants' submissions.

### B. Excessive Force

Ferguson alleges that Yocum violated the Fourth and Fourteenth Amendments by using excessive force in arresting her. Compl. ¶ 38. Defendants move to dismiss, arguing that Yocum is entitled to qualified immunity.

A motion to dismiss based on qualified immunity requires the Court to analyze (1) whether the plaintiff has stated a plausible claim for a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the

alleged violation. *Dollar Loan Ctr. of S.D., LLC v. Afdahl*, 933 F.3d 1019, 1024 (8th Cir. 2019). "To deny qualified immunity, the answer to both questions must be yes." *Cravener v. Shuster*, 885 F.3d 1135, 1138 (8th Cir. 2018) (citation omitted). The Court is free to consider the questions in either order. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017) (citation omitted). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Franklin for Estate of Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Excessive-force claims are analyzed under the Fourth Amendment's "reasonableness" standard. *See Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citation omitted). The test is whether the force was objectively reasonable from the perspective of a reasonable officer on the scene. *Id.* "Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (cleaned up). Although "force is least justified against a nonviolent misdemeanant," the level of force reasonably applied may increase with the level of resistance to arrest. *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020); *see also Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010) ("'Resistance,' however, should not be understood as a binary state, with

resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer.").

The right to be free from excessive force is, of course, well established. *Ehlers*, 846 F.3d at 1012. But to overcome qualified immunity, a plaintiff must show more than that the law was clearly established "at a high level of generality." *Id.* (citation omitted). Instead, "the violative nature of *particular* conduct [must be] clearly established." *Id.* (citation omitted). Existing law "must be clear enough that a reasonable officer would understand that the act in question violates the right." *Kohorst*, 968 F.3d at 876. It is not necessary that a prior judicial opinion has expressly determined that the precise actions are unlawful, *Ehlers*, 846 F.3d at 1008, but the plaintiff nevertheless bears the burden of identifying "either 'controlling authority' or 'a robust consensus of cases of persuasive authority'" that puts the "constitutional question beyond debate," *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). Whether the facts alleged in a complaint sufficiently support a claim that an officer's conduct violated clearly established law is a legal question for the Court. *Brown*, 574 F.3d at 499.

Ferguson does not dispute that Yocum had the right to arrest her and could therefore lawfully use some degree of force to carry out the arrest. Pl.'s Mem. Opp.

Mot. Dismiss 13, ECF No. 16.  Instead, she alleges that, given her age and physical infirmities, Yocum's use of pain-compliance techniques was unreasonable because there were less intrusive means available to remove her from the fence.  Compl. ¶¶ 20–21.  Ferguson also asserts that, at the time of her arrest, it was clearly established that the use of pain-compliance techniques on a passively resisting protester in the course of arresting her for minor crimes constituted excessive force.  The cases on which Ferguson relies, however, are distinguishable in material respects.

Ferguson first cites *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002).  In *Headwaters*, passive protesters linked themselves together in lockdown devices that required each protester to unclip shielded carabiners to disconnect.  *Id.* at 1127–28.  During three separate demonstrations, police used Q-tips to apply pepper spray directly to the eyes of recalcitrant protesters.  *Id.* at 1128–29.  At one demonstration, the officers repeatedly applied the pepper spray to protesters' eyes and then let the pepper spray burn the protesters' eyes for up to 20 minutes before periodically diluting the pepper spray with water over the course of an hour.  *Id.* at 1128.  At the other demonstrations, police followed the initial application of pepper spray to the eyes with Q-tips by spraying the each protester in the face with pepper spray from just inches away.  *Id.* at 1128–29.

The Ninth Circuit reversed summary judgment for the defendant officers, concluding that "it was excessive to use pepper spray against the nonviolent protesters under these circumstances." *Id.* at 1130–31.  The court reasoned that the use of pepper spray was unnecessary to subdue, remove, or arrest the protesters because the protesters were passive and the officers could have easily removed the protesters while they were still in the lock-down devices or easily removed the devices from the protesters by using electric grinders.  *Id.* at 1130.  The court determined that any use of pepper spray—but especially the repeated application of the pepper spray directly to the protesters' eyes and the delay in rinsing their eyes—was clearly unreasonable and excessive under the circumstances.  *Id.* at 1130–31.

*Headwaters* is distinguishable for several reasons.  First, the amount of force employed was vastly different.  Yocum's use of force against Ferguson was brief and episodic, with each of the three uses of force lasting between four and 40 seconds.  In contrast, the officers in *Headwaters* repeatedly subjected the protesters to pepper spray and in one instance refused to rinse the protesters' eyes for 20 minutes.  *Id.* at 1128–29; *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1193 (9th Cir. 2000) [*hereinafter Headwaters I*], *vacated*, 534 U.S. 801 (2001), *remanded to* 276 F.3d 1125 (9th Cir. 2002).

Second, Yocum and other officers attempted to negotiate with Ferguson prior to the use of force, giving her about two hours to comply.  Compl. ¶ 22.  In addition,

before any force was used—and then again after each use of force—Ferguson was urged to release her grip on the fence. In contrast, the officers in *Headwaters* did not attempt to negotiate with the protesters prior to using force. *Headwaters I*, 240 F.3d at 1192–95. Although the officers did warn of the imminent use of pepper spray and set a deadline, they sprayed the protesters before the deadline arrived. *Id*. Further, for some of the protesters, the officers allowed the pain to continue uninterrupted until the protesters complied, without giving the protesters a reprieve from the pain to reconsider his or her decision. *Id*.

Third, Ferguson actively gripped the chain with her hands, rather than passively refusing to take action to unclip herself. Because of Ferguson's resistance, Yocum had no alternative but to use force on Ferguson's hands and arms in order to remove her from the protest site.[1] *Cf. Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) ("Police officers . . . are not required to use the least intrusive degree of force possible.").

---

[1] Ferguson argues that Yocum should have attempted to pry her hands away from the chain rather than resorting to pain-compliance techniques, because her hands are arthritic and therefore would have been easy to remove. Compl. ¶ 21. The Arrest Video shows that Yocum *did* spend about eight seconds attempting to remove Ferguson's hands—and that he failed because they were *not* easy to remove. Yocum stopped when Ferguson yelled that his attempt to pry her hands was hurting her. Arrest Video at 00:16–00:24. Even assuming that Yocum knew about Ferguson's physical infirmities (which the Arrest Video indicates she did not disclose until *after* the pain-compliance techniques were employed), a reasonable officer may well have concluded that there was less risk of injury in using the pain-compliance techniques than in wresting arthritic hands from a chain.

In contrast, the officers in *Headwaters* could have used electric grinders to remove the lock-down devices quickly and without injury—as they had often done in the past. *Headwaters I*, 240 F.3d at 1191–92.  Further, the protesters and their attached devices could be (and ultimately were) easily picked up and moved on stretchers, due to the protesters' utter passivity.  *Headwaters*, 276 F.3d at 1128.

Finally, pressure points, arm bars, and compression wrist locks are not comparable to pepper spray.  True, both inflict pain, but there is a difference between the use of a chemical agent and bodily manipulation.  *See Ehlers*, 846 F.3d at 1012 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) ("[S]pecificity is especially important in the Fourth Amendment context.").  For purposes of qualified immunity, the type of force used is significant.  *See, e.g.*, *Brown*, 574 F.3d at 498 n.5 (noting that "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing.").  Thus, *Headwaters* did not clearly establish that Yocum's conduct violated Ferguson's Fourth Amendment rights.

Ferguson next cites *Amnesty America v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004).  In *Amnesty*, protesters blocked access to an abortion clinic by chaining themselves together.  *Id.* at 118.  When police attempted to remove them, the protesters refused to unlock the chains, went limp, and refused to cooperate.  *Id.*  The police acknowledged using a pain-compliance technique called a "come-along hold," but the

-11-

protesters alleged that the "police officers' excessive uses of force included lifting and pulling plaintiffs . . . by pressing their wrists back against their forearms in a way that caused lasting damage; throwing [one plaintiff] face-down to the ground; dragging [another plaintiff] face-down by his legs, causing a second-degree burn on his chest; placing a knee on [a third plaintiff]'s neck in order to tighten his handcuffs while he was lying face-down; and ramming [his] head into a wall at a high speed." *Id.* at 119, 123. The Second Circuit reversed summary judgment for the defendants, finding that "the district court improperly resolved issues of fact against the plaintiffs." *Id.* at 123.

Again, *Amnesty* is easily distinguishable from this case. To begin with, *Amnesty* did not involve qualified immunity and, unlike in this case, there were disputes of material fact. In any event, Ferguson does not allege anything like what the protesters in *Amnesty* alleged: no dragging face-down across the ground, no knees on necks, no high-speed ramming of heads into walls. That a similar pain-compliance technique may have been employed along with these more extreme uses of force does not clearly establish that the use of the pain-compliance technique *alone* would have violated the protesters' rights. Moreover, in contrast to the protesters in *Amnesty* who were utterly limp and passive, Ferguson was actively resisting by gripping the chain with both hands.

Ferguson also points to *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52 (1st Cir. 2008). In that case, journalists had gathered outside an apartment building to observe the execution of a search warrant. *Id.* at 55. The journalists entered a gated area and were ordered to leave, "but were hindered by the agents' attempts to push the crowd through the narrow opening." *Id.* at 56. Even though the plaintiffs acted peacefully and attempted to comply with law enforcement's orders, the plaintiffs were "pushed, punched, hit by metal batons, and pepper sprayed in the face by federal agents." *Id.* at 56, 59. The First Circuit held that the "mere obstinance by a crowd . . . is insufficient to warrant the show of force that . . . was exhibited by the law enforcement officers here." *Id.* at 60. Obviously, this is a much different case. Ferguson never attempted to comply with the orders of Yocum, and the force employed by Yocum pales in comparison to the force used in *Asociacion de Periodistas*.

Other cases on which Ferguson relies are likewise readily distinguishable. *See, e.g.*, *Brown*, 574 F.3d at 494, 496 (officer summarily and without warning tased suspected misdemeanant in drive-stun mode[2] for failing to obey command to end 911 call during a

---

[2]When used in drive-stun mode, the taser makes direct contact with the subject's body and acts as a means of pain compliance that does not paralyze or incapacitate the subject, whereas in dart mode, the taser fires metal probes into the subject's skin and delivers a "shock that lasts up to five seconds and causes electrical muscular disruption." *See Cravener v. Shuster*, 885 F.3d 1135, 1137 n.1 (8th Cir. 2018) (citations omitted).

late-night traffic stop); *Kulka v. Hulm*, 310 F.3d 1046, 1048, 1050 (8th Cir. 2002) (officer twisted and raised misdemeanant's arm and applied handcuffs tightly enough to break his wrist despite only verbal resistance to arrest). Moreover, contrary to Ferguson's claim that the law governing her situation was clearly established, many cases—including some that have more in common with this case than the cases on which Ferguson relies—have found that the use of pain-compliance techniques on passively resisting arrestees can be constitutional. *See, e.g.*, *Forrester*, 25 F.3d at 805–07 (using "pain-compliance techniques," including "firm grip, wrist-and-arm-twisting, and pressure point holds," on completely passive anti-abortion protesters who refused to leave abortion clinic was not excessive force); *Ehlers*, 846 F.3d at 1011 (using a taser in drive-stun mode on misdemeanant arrestee who reasonably appeared to be noncompliant was not excessive force); *Cravener v. Shuster*, 885 F.3d 1135, 1137–38 (8th Cir. 2018) (finding no excessive force when police placed a mentally ill person in a "modified bent arm lock" and tased him five times in drive-stun mode because he was noncompliant and passively resisting by pulling away and locking his arms under him to avoid being taken to the hospital); *see also Linton v. Zorn*, No. 5:18-cv-5, 2022 WL 17080324, at *9–*14 (D. Vt. Oct. 19, 2022) (finding no clearly established law on remarkably similar facts in which an officer used a "wrist compression" pain-

compliance technique against a peaceful protester who refused to stand up to leave a sit-in and had linked arms with other protesters).

In sum, Ferguson has not met her burden of identifying "either 'controlling authority' or 'a robust consensus of cases of persuasive authority'" that puts the constitutionality of Yocum's actions "beyond debate." *Kelsay*, 933 F.3d at 979 (quoting *al-Kidd*, 563 U.S. at 741–42)).

Finally, Ferguson argues, in the alternative, that the complaint states a plausible excessive force claim because Yocum "misused" otherwise valid pain-compliance techniques. Pl.'s Mem. Opp. Mot. Dismiss 11–12, ECF No. 16. She offers a simple syllogism: If the techniques are used properly, then the subject is not supposed to suffer a physical injury, but she suffered a physical injury, so the techniques must not have been used properly. Compl. ¶¶ 24–25.

The degree of injury is relevant in deciding whether a use of force violated the Fourth Amendment, but the Eighth Circuit has made it clear that the degree of injury is just one of many factors that must be considered. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted."). Standing alone, therefore, Ferguson's alleged injuries are insufficient to show that the force was unreasonable. Ferguson must still identify clearly established law

demonstrating that Yocum's particular use of force was unreasonable.  *Kelsay*, 933 F.3d at 979.

Ferguson cites a single unpublished case that makes the unremarkable statement that "[m]isuse of a valid policing technique can turn into unreasonable force."  *Hagen v. Palmer*, No. Civ. 024318 (RHK/AJB), 2003 WL 22136067, at *1, *3 (D. Minn. Sept. 12, 2003) (denying motion for summary judgment where officer abruptly and without warning grabbed compliant suspect's hands and head, yanked the suspect down, and "bowed" the suspect's legs, causing him to "buckle[] back").  But that statement gives no guidance about *when* "[m]isuse of a valid policing technique" turns into "unreasonable force," and thus it is plainly insufficient to clearly establish that Yocum's alleged misuse of the pain-compliance techniques at issue in this case was unreasonable.  Moreover, *Hagen* is not "controlling authority," and Ferguson has failed to identify "a robust consensus of cases of persuasive authority."  *Kelsay*, 933 F.3d at 979 (citation omitted).  For these reasons, the Court holds that Yocum is entitled to qualified immunity, and Ferguson's excessive-force claim must be dismissed.

### C. State-Law Claims

Ferguson also brings state-law claims of assault and battery against Yocum and the County.  Because the Court has dismissed the only claim over which it had original jurisdiction, the Court declines to exercise supplemental jurisdiction over Ferguson's

state-law claims.  28 U.S.C. § 1367(c)(3); *Barstad v. Murray Cty.*, 420 F.3d 880, 888 (8th Cir. 2005) (courts should ordinarily decline supplemental jurisdiction when all original-jurisdiction claims have been eliminated before trial).  Those claims are therefore dismissed without prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss [ECF No. 9] is GRANTED as to Count 1 of plaintiff's complaint [ECF No. 1], and that claim is DISMISSED WITH PREJUDICE AND ON THE MERITS.

2. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over plaintiff's remaining claims, and therefore those claims are DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 25, 2024

_____
Patrick J. Schiltz, Chief Judge
United States District Court